2014 VT 63

## Donald J. Spencer v. Gerda Spencer

[100 A.3d 334]

No. 12-465

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed June 27, 2014

*Jean Brewster Giddings* and *David M. Schultz* of *Fitts, Olson & Giddings, PLC*, Brattleboro, for Plaintiff-Appellant.

*Angela J. Prodan* of *Corum Mabie Cook Prodan Angell & Secrest, PLC*, Brattleboro, for Defendant-Appellee.

¶ 1. **Skoglund, J.** Husband appeals from a decision of the superior court, family division, denying a motion for relief from a divorce judgment that awarded wife a percentage of his military pension. Husband contends the court abused its discretion in: (1) denying the motion, and (2) failing to hold a hearing on the merits. We reverse.

¶ 2. The material facts may be summarized as follows. The parties were married in 1981. In 1998, husband retired from the United States Army after almost twenty-two years of service. About two years later, in November 2000, the parties were divorced in Vermont pursuant to a stipulated judgment. The judgment provided that husband's military pension "shall be shared by the parties as a portion of their marital property" as follows: "[Wife] shall receive 41.8% of [husband's] total army pension as marital property by direct payment of retirement pay in monthly installments by the Defense Finance Accounting Service [DFAS] at the address provided by her. The term 'total army pension' shall be construed to mean 41.8% of [husband's] gross pay received therefrom." The DFAS thereafter garnished wife's share of the pension and paid it directly to her.

¶ 3. In 2009, eleven years after husband's retirement and nine years after the parties' divorce, husband was recalled from retirement to serve as a military instructor in the ROTC program at the University of New Hampshire.[1] He was discharged from the military in 2012, after three years in this position. During the three years of husband's recall, his pension benefits were suspended so that neither he nor wife received any benefits.

¶ 4. Husband's additional service resulted in an increase in his monthly pension benefit. When contacted by husband, the DFAS indicated that it would continue to pay wife 41.8 percent of the benefit, as provided in the divorce judgment, resulting in an increase in the total amount of her payment.

¶ 5. In response, husband filed a motion to amend in the family court, asserting that payment of the "straight percentage" provided in the divorce judgment would result in "over-payments" to wife, and proposing to amend the order to provide as follows: "[Wife] is awarded 41.8% of the disposable military retired pay

---

[1] There does not appear to be any dispute that husband's recall was voluntary, though the parties appear to attribute different significance to that fact. Our analysis does not turn on the question of whether his recall was voluntary.

[husband] would have received had [husband] retired with the rank of MSG/E8 and with 21.83 years (21 years and 10 months, or 262 months) of creditable service on May 31, 1998, by direct payment in monthly installments by the Defense Finance Accounting Service at the address provided by her." The modified language would thus have made it clear that wife's payment was to be calculated based on husband's completed service at the time of the divorce.

¶ 6. Wife, in response, moved to dismiss the motion, asserting that the property division in the divorce judgment was final and not subject to modification absent evidence of fraud or coercion or other extraordinary circumstances entitling a party to relief under Vermont Rule of Civil Procedure 60(b). She also sought attorney's fees. Husband then filed an additional motion to clarify that, pursuant to Rule 60(b)(6), he was seeking "to modify the final divorce order so as to reflect the parties' intended property division at the time of the divorce." He also filed an opposition to the motion to dismiss, claiming that the parties had not contemplated any additional military service when they agreed to the pension division, and that the requested modification was "to implement the original agreement between the parties." Wife's responsive pleadings asserted that husband had failed to identify any extraordinary circumstances that would warrant reopening or modifying the final judgment.

¶ 7. Based on the pleadings, the trial court issued a written decision denying husband's motion. The court concluded that, although wife "may enjoy an inflated share of [husband's] pension" as a result of husband's additional post-divorce service, this did not provide a basis to alter the judgment where the pension provision was otherwise clear and the product of the parties' agreement. The trial court also ruled that the issue was sufficiently "complex and unsettled" that, absent any showing of bad faith on the part of husband, it would deny wife's request for attorney's fees. This appeal by husband followed.

¶ 8. ██ It is well settled that relief from a final judgment should be granted only in extraordinary situations to "prevent hardship or injustice." *Cliche v. Cliche*, 143 Vt. 301, 306, 446 A.2d 314, 316 (1983). We have applied this rule to reject requests for post-divorce modification of military pensions, most recently — as the trial court here noted — in *Callahan v. Callahan*, 2008 VT 94,

184 Vt. 602, 958 A.2d 673 (mem.), and *Youngbluth v. Youngbluth*, 2010 VT 40, 188 Vt. 53, 6 A.3d 677. Neither decision is particularly apposite here, however. Although the former involved a motion to modify a military pension, the case was resolved on the basis of the untimeliness of husband's motion, and stands for the unexceptional proposition that parties are generally bound by the plain language of their agreement. 2008 VT 94, ¶ 15. *Youngbluth* is also distinguishable, involving a request — prohibited by federal law — to conflate pension and disability benefits, and again confirms the general rule that agreements should be enforced according to their terms, and that finality in property settlements is the norm. 2010 VT 40, ¶¶ 8, 26. Thus, neither case involved the precise question presented here, as to whether a pension division in a divorce decree may be modified to allow the DFAS to distribute wife's portion in conformity with the parties' expectations, based on husband's completed military service at the time of the divorce.

¶ 9. The question for decision, therefore, is whether the trial court abused its discretion in declining to determine whether, in fairness and equity, it was appropriate to reform the language of the parties' divorce decree to conform to their expectations. See *Callahan*, 2008 VT 94, ¶ 9 (observing that "[r]ulings on motions for relief from judgment are left to the sound discretion of the trial court" and will not be disturbed absent a showing that the court abused or withheld its discretion). Although, in denying the motion, the trial court here was concerned that the record was unclear as to the origins of the forty-one percent pension allocation to wife, there was no disagreement or uncertainty about the parties' intentions. Wife did not dispute husband's claim that the inclusion of his post-divorce military service would result in wife's "receiv[ing] benefits far in excess of what originally was agreed between [the parties] at the time of the original [d]ivorce [o]rder," or his affidavit stating that there was no expectation of post-divorce military service at the time of the decree. Indeed, wife concedes on appeal that "[i]t is *irrelevant* as to how the parties in the present matter ultimately reached an agreement that [wife] would receive 41.8%," and acknowledges that application of the plain language of the pension provision would produce an "unexpected outcome." Wife simply argues, as she did below, that the plain language of the divorce agreement trumps those expectations.

¶ 10. Thus, this is not a case where — as the trial court stated — the parties' intentions about husband's post-divorce service

were "inescapably speculative," as one might reasonably conclude in the more typical divorce situation involving the division of a spouse's pension who was *still* employed at the time of the divorce. There, the pension is marital property but still somewhat inchoate, the time in-service by the spouse holding the pension (the denominator in the so-called coverture fraction) is still in play, and the pension's ultimate value is still unknown. In that case, it may be plausible to infer an intent that the nonemployed spouse should benefit from the post-divorce employment because some of the power to produce the added value was acquired during the marriage.

¶ 11. But that is not *this* case. Here, husband had already been retired for several years at the time of the divorce, following twenty-two years of military service. His in-service time was not unknown or still evolving but complete, and there was no expectation by the parties that husband would continue in service — accruing additional time, promotions, and salary advancements — some portion of which might be attributable to wife's contributions. On the contrary, it is reasonable to assume here that the pension award to wife — based on the plain language of the parties' stipulation — reflected not only their understanding that husband's military service was complete, but also their judgment that the pension award represented a fair measure of compensation for wife's contributions to its then fully realized value, established when husband's service ended and distribution of the pension commenced.[2]

¶ 12. ■ The military pension in this case is thus akin to any other marital asset, whose value for distribution purposes was

---

[2] With respect, the dissent's characterization of both wife's claims and the consequences of today's decision are exaggerated. To be sure, wife filed a pleading in which she offered a specific rationale for the derivation of her 41.8% pension award, but she did not, as the dissent asserts, "essentially argue[ ] that . . . the parties intended, or would have intended, to apply the same coverture formula" to husband's increased salary based on his post-divorce additional service. *Post*, ¶ 26. She simply argued, in the same pleading, that the plain language of the judgment and the "principle of finality . . . must outweigh any claims of inequity" resulting from applying the plain language in these circumstances. Nor does our holding "open[ ] the door to a host of claims by pensioners" seeking to overturn property awards. *Post*, ¶ 34. The assertion is speculative and unsupported, and largely contradicted by the dissent's earlier recognition that our decision is "based on a specific set of facts" and does not represent any sort of "shift" in our jurisprudence. *Post*, ¶ 30.

properly determined and divided at the time of the final divorce hearing, *Hayden v. Hayden*, 2003 VT 97, ¶ 8, 176 Vt. 52, 838 A.2d 59, rather than a still-evolving asset whose value remained unsettled. Indeed, in these circumstances, where husband has already retired and his pension is under distribution, pension benefits acquired due to unanticipated post-divorce service are more like property acquired strictly after the marriage, and therefore not subject to equitable distribution. See *Golden v. Cooper-Ellis*, 2007 VT 15, ¶ 10, 181 Vt. 359, 924 A.2d 19 (marital property is generally determined and valued as of the date of the final divorce hearing).

¶ 13. ■ ■ We thus conclude that the case must be remanded to afford the parties a hearing to address whether the modification sought by husband is absolutely necessary to "prevent hardship or injustice." *Cliche*, 143 Vt. at 306, 466 A.2d at 316. To be sure, the burden is on the party seeking relief under Rule 60(b) to plead facts "with sufficient particularity to warrant a hearing and potential relief," *LaFrance Architect v. Point Five Dev. S. Burlington, LLC*, 2013 VT 115, ¶ 20, 195 Vt. 543, 91 A.3d 364, and husband's motion and affidavit here could have stated more clearly the basis of the claim and the request for a hearing. As noted, however, wife did not contest husband's characterization of the parties' expectations, and concedes as much on appeal. In these circumstances, husband's request for a hearing only "if the court deems it necessary" is understandable, and should not operate to deny him that opportunity. Accordingly, we conclude that the judgment must be reversed, and the matter remanded for further proceedings.

*Reversed and remanded.*

¶ 14. **Robinson, J.,** dissenting. The majority opinion makes a leap from the parties' shared *expectation* at the time of their divorce that husband would not accrue more years of service in connection with his military pension to a nonexistent, undisputed shared *intention* as to how the pension benefit should be allocated in the event that he returned to active service. In so doing, it ignores the plain terms of the parties' final divorce agreement and ensuing court order, disrupts the finality of that order, and disregards the principles underlying traditional coverture-fraction-based pension allocations. For these reasons, I respectfully dissent.

## I.

¶ 15. I note at the outset the multiple challenges husband should face in his effort to rewrite the parties' agreement concerning his military pension. First, the trial court's exercise of discretion here is entitled to substantial deference. We ordinarily review a decision to grant or deny a motion under Rule 60(b), applicable in the family court through Vermont Rule for Family Proceedings 4(a)(1), for abuse of discretion. *Pierce v. Vaughan*, 2012 VT 5, ¶ 9, 191 Vt. 607, 44 A.3d 758 (mem.).

¶ 16. Second, even in the trial court, the strong presumption was against husband's argument. This Court has strongly disfavored Rule 60(b)(6) motions directed at property division orders where the appellant seeks relief from a judgment because its terms became unexpectedly onerous. See, e.g., *Wilson v. Wilson*, 2011 VT 133, ¶ 6, 191 Vt. 560, 38 A.3d 50 (mem.) (upholding trial court's dismissal of motion to set aside requirements of property division order that had given rise to financial hardship for husband).

¶ 17. Two prior decisions of this Court are particularly instructive. In *Callahan v. Callahan*, this Court reviewed a trial court's denial of a Rule 60(b)(6) motion filed by a husband who, seven years after the final divorce order, sought relief from a stipulated order awarding his ex-wife twenty-five percent of his monthly pension. 2008 VT 94, 184 Vt. 602, 958 A.2d 673 (mem.). This Court affirmed the trial court's denial of the husband's Rule 60(b) motion on the basis that it was untimely, *id.* ¶¶ 9-11, but went on to consider the merits of husband's claim. The husband argued that allocation of twenty-five percent of his retirement pay to his wife, without adjustment of that sum by the coverture fraction, would result in payment to the wife of pension benefits accrued outside of the marriage.[3] He argued that the terms of the final property division order should be construed to include a coverture-fraction adjustment to husband's retirement pay. *Id.* ¶ 15. This

---

[3] The coverture fraction is used to determine what portion of a retirement entitlement accrued during the marriage. *McDermott v. McDermott*, 150 Vt. 258, 261, 552 A.2d 786, 789 (1988). "The numerator of the fraction is the number of months or years that the employee participated in the plan during the marriage, and the denominator is the total number of months or years that the employee will have participated in the plan at retirement." *Id.*

8

Court responded:

> In a contested divorce, equity requires that the family court distribute only the part of a spouse's pension that accrued during the period of the marriage. The portion of the entitlement acquired during the marriage is calculated by factoring in the so-called coverture fraction. Where, as here, the parties voluntarily agree to an apportionment of a spouse's pension, however, the court must enforce the plain language of the agreement. The pension provision in the stipulation plainly reads: "25% of [husband's] monthly pension income shall be paid to [wife]" without reference to the length of the marriage or any applicable coverture fraction. Thus, it was reasonable for the court to determine that wife is entitled to receive 25% of husband's gross retirement pay, and we will not disturb its order.

*Id.* (citations omitted). This Court's analysis in *Callahan* reinforces that the parties' agreement controls once it is incorporated into a court order. According to *Callahan*, an agreement reflecting a fixed percentage-based allocation of pension benefits without reference to an adjustment by the coverture fraction is not presumed to be subject to such an adjustment.

¶ 18. A second significant, but not controlling, decision is *Youngbluth v. Youngbluth*, 2010 VT 40, 188 Vt. 53, 6 A.3d 677. In that case, the trial court granted the wife "35% of the marital portion of the retirement plan," which translated to 19.81% of the husband's monthly military retirement benefits. *Id.* ¶ 2. After the final divorce order, the Veteran's Administration assigned a disability rating to the husband and, as a consequence, a significant portion of the husband's taxable retirement benefits were forfeited and replaced dollar-for-dollar by tax-exempt and garnishment-exempt disability benefits. *Id.* ¶ 3. The wife then asked the court to amend the property division order to give her a larger portion of the husband's retirement benefits than the 19.81% reflected in the original order to account for the fact that husband had sheltered some of his retirement benefits by essentially converting them to disability benefits, leaving wife with 19.81% of a reduced monthly retirement benefit. *Id.* ¶ 5. The trial court treated the wife's motion as a motion to enforce and, by way of enforcement of the original order, changed the percentage of the husband's retirement benefit

allocated to the wife to 22.5% based on expert testimony that this change would yield a monthly benefit comparable to the expected monthly benefit at the time of the final order. *Id.*

¶ 19. This Court reversed, and held that the wife was entitled only to 19.81% of the monthly retirement benefit as reflected in the final order. *Id.* ¶ 8. The decision is not controlling here, both because this Court expressly left open the question of whether wife could have obtained relief through a Rule 60(b) motion, and because the analysis turned on the unique status of military disability benefits under federal law. *Id.* ¶¶ 10, 12-27. But this Court's discussion in *Youngbluth* offers lessons for this case. First, this Court rejected the argument that reforming a final property division order to conform it to what the parties purportedly *really* meant to say did not undermine the goal of finality:

> [T]he trial court correctly recognized that "a property settlement is meant to happen once." Under Vermont law, the initial property division order "shall settle the rights of the parties to their property." Parties should not have to bring further litigation whenever future actions affect the division of benefits. We recognize that it may be argued that here it was husband's actions — in unilaterally applying for disability benefits — that upset the finality of the original property division order. To focus on this, however, is to ignore the critical point that finality is about ending litigation. Indeed, we define a final judgment as one where "the effect . . . is to end the litigation."

*Id.* ¶ 18 (citations omitted).

¶ 20. Second, this Court recognized that in the absence of some sort of indemnity clause, and without any specific dollar amount associated with the pension award, the fixed-percentage formulation in the order concerning division of husband's pension "put wife on constructive notice that 19.81% of husband's retirement benefits could result in a different dollar amount from month to month." *Id.* ¶ 23. This Court noted that the trial court in *Youngbluth* had effectively retroactively added an indemnity provision to the original order to protect the wife against changes in the dollar amount of the retirement benefit actually paid, and pointed to this Court's prior statement that where the language of a property division order " 'could have provided for security, but it failed to do so,' we will not retroactively add provisions to

protect one of the parties." *Id.* ¶ 26 (citing *Sumner v. Sumner*, 2004 VT 45, ¶ 9, 176 Vt. 452, 852 A.2d 611). This Court continued:

> We recognize that the trial court was faced with a difficult situation and that it was attempting to find an equitable solution, but such a solution was not possible in an enforcement proceeding given the clear text in the original property division order granting wife only 19.81% of husband's disposable retirement benefits. As we have noted in similar situations, when a party's main complaint is not with the text of the [original property division order], but with its unexpected outcome, it is error for the trial court to stray from the clear language of the order and to recast the equities.

*Id.* (quotations omitted).

¶ 21. Our discussion in *Youngbluth* further reinforces the very high bar husband must overcome in order to disrupt the finality of the original divorce order and to persuade a court to alter the clear fixed-percentage allocation of retirement benefits reflected in that order to account for an unexpected set of circumstances.

## II.

¶ 22. Husband's motion here rests on his assertion that the parties intended wife to receive a pension benefit equal to 41.8% of husband's retirement benefits calculated with reference to the benefits he was receiving, and expected to continue to receive, as of 2000, without regard to changes in those benefits on account of husband's return to active military service for a period. In so asserting, husband, like the wife in *Youngbluth*, asks the courts to set aside the plain language of the stipulated order providing for wife to receive a fixed percentage of husband's retirement pay in favor of a revised order that reflects the terms husband asserts the parties *really* intended. The majority opinion asserts that "there was no disagreement or uncertainty about the parties' intentions." *Ante,* ¶ 9. This assumption, on which the entire majority opinion rests, is directly at odds with the record.

¶ 23. The final divorce order provided in relevant part:

> The parties acknowledge that they were married on November 10, 1981 . . . . The parties acknowledge that [husband] receives retirement benefits from a military

pension resulting from his service in the U.S. Army. The military pension benefits described hereafter shall be shared by the parties as a portion of their marital property. [Wife] shall receive 41.8% of [husband's] total army pension as marital property by direct payment of retirement pay in monthly installments by the Defense Finance Accounting Service at the address provided by her. The term "total army pension" shall be construed to mean 41.8% of [husband's] gross pay received therefrom.

At the time of the final divorce in 2000, husband was retired from the military, and neither party expected that he would return to active service. The parties' underlying stipulation says nothing to suggest how the parties would have allocated the military pension if husband returned to active service after the final divorce.

¶ 24. In the affidavit supporting his Rule 60(b) motion, husband states:

My total military pension payments at the time of my divorce were based on the length of my service at that time, and based on the length of our marriage during the time that I served in the military, my ex-wife and I agreed that she should receive 41.8% of my military pension payments.

Although husband recites the predicate facts that gave rise to the parties' agreement, he does not offer any evidence on the question of the parties' agreement, if any, as to application of the stipulation in the event of future military earnings by husband; he just asserts that the parties did not contemplate such earnings. Nor does husband offer any information about the *derivation* of the 41.8% figure, from which a factfinder might extrapolate to discern a shared intention with respect to this unanticipated circumstance. The majority infers that husband testified that the parties intended that wife's actual-dollar benefit be fixed (presumably subject to cost-of-living adjustments) at the time of the final divorce without regard to future changes, and then embraces the inferred testimony as reflecting undisputed fact.

¶ 25. In her pleadings below, wife very much disputed this conclusion. She explained that the original pension division was calculated on the basis of the following formula: 2.5 (Retired Pay Multiplier) x 21.83 (years of actual time in service) x 199 (months

of marriage while member was on active duty)/262 (total months of member's active duty). The first two figures in this formula (2.5 x 21.83 years) determine the percentage of final month active duty base pay payable to husband — in this case 55%. The last two figures represent a conventional coverture fraction. Wife explained that this formula initially yielded the 41.8% figure. If the court were to use the formula the parties used to derive the 41.8% figure, applying an updated coverture fraction to reflect husband's additional years of service outside of the marriage, wife argued, the dollar benefit due to her would actually *increase* on account of the increase in the percentage of final pay due to husband on account of the increased years of husband's actual service. In particular, she would be entitled to 63% x 199/297, or 42.2% of husband's pension benefit.[4] Wife essentially argued that a reformation of the final divorce order consistent with *her* understanding of the parties' intentions at the time of that order would yield a much higher actual benefit to her than the rewrite advocated by husband.

¶ 26. The parties obviously agreed as to the percentage of husband's pension to be allocated to wife based on their shared assumptions at the time, and that percentage is reflected in the final order. But they clearly do not agree about the impact of unanticipated future active service by husband and consequent increase in his pension benefit on that percentage allocation. Husband argues for an alternative calculation that would yield for wife the fixed-dollar amount associated with the agreed-upon percentage at the time of the final divorce based on his actual benefit at that time. Wife essentially argues that in such a circumstance the parties intended, or would have intended, to apply the same coverture formula that she claims they used to derive the percentage allocation in the first place. Evidence of the derivation of the percentage the parties used could help a court sort through the parties' competing claims as to their intentions at the time of the final divorce. Husband declined to offer any such evidence beyond his bare inferred assertion.

---

[4] Assuming that husband's additional service upon being recalled was 36 months, as represented in wife's calculations, wife's calculation of the new product of husband's actual years of service and the 2.5 multiplier appears to round up nearly a whole point. (2.5 multiplier x 24.83 (revised total years of actual service) = 62.08).

¶ 27. On this record, I cannot conclude that the trial court abused its discretion in denying husband's motion. First, like the stipulation in *Callahan*, the stipulation underlying the original order in this case includes no explanation of the derivation of the fixed-percentage allocation reflected in the stipulation, and no basis for presuming or divining an intent at odds with the plain language of the stipulation. And like the stipulation in *Youngbluth*, the stipulation and divorce order in this case as written put both parties "on constructive notice that [48.1%] of husband's retirement benefits could result in a different dollar amount from month to month." 2010 VT 40, ¶ 23. The absence of any explanatory language that might support husband's proposed revision of the order's language supports the trial court's conclusion that any attempt to discern the parties' intentions in reaching the 41.8% allocation would be speculative.[5]

¶ 28. Second, husband's proposed alternative language apparently embraced by the majority would yield results at odds with the general practice in pension allocation. When parties divorce while the party entitled to pension benefits is still working, the pension division order typically allocates to the other party a share — often but not necessarily 50% — of the pension benefit accrued during the marriage. The pension benefit accrued during the marriage is generally deemed to be the pension benefit upon retirement discounted by the coverture fraction. *McDermott*, 150 Vt. at 261, 552 A.2d at 789. "The numerator of the fraction is the number of months or years that the [prospective pensioner] participated in the plan during the marriage, and the denominator is the total number of months or years that the [pensioner] will have participated in the plan at retirement." *Id.* As the prospective pensioner continues to work post-divorce, such that the denominator of the coverture fraction grows, the percentage of the final pension benefit attributable to the marriage and subject to division shrinks. If husband were merely seeking to reform the original

---

[5] Husband argues that given the parameters of the military retirement benefits at issue, and given that he was already retired at the time of the parties' divorce, the parties had no choice but to express the pension allocation as a fixed percentage rather than as a "formula" award or a "hypothetical" award pursuant to Defense Finance Accounting Service (DFAS) guidelines. Even assuming that is true with respect to the operative provision of the pension division order, there is nothing in the applicable regulations that prevented the parties from including in their stipulation the derivation of the flat-percentage figure that they used or the formula, if any, upon which the figure was based.

divorce order to include a revised calculation of the coverture fraction to adjust the percentage of his pension benefit upon retirement subject to division with wife, his motion might make more sense.

¶ 29. But husband is seeking more than that. In the "ordinary" situation described above, the *percentage* of the prospective pensioner's retirement benefit subject to allocation to the former spouse decreases with the pensioner's additional years of pre-retirement, post-marriage service, but an increase in the *amount* of the pensioner's retirement benefit enures to the former spouse's benefit. The amount of the former spouse's share of a pension payment is not necessarily the same if the pensioner retires the day after the divorce as it would be if the pensioner retired ten years later. We have recognized that a pensioner "can greatly enhance the value of [a] pension by continuing . . . post-divorce employment," and that some of the power to produce this enhancement was acquired during the marriage. *Id.* at 260, 552 A.2d at 788. Husband's proposed revision of the final divorce order turns this approach on its ear such that it would be difficult for a court to infer, without something more, that husband's proposed revision squares with the parties' true intentions in signing the stipulation.

¶ 30. The majority dismisses the principles underlying this Court's case law concerning the application of the coverture fraction to defined-benefit plans, suggesting that in contrast to cases in which the spouse with an anticipated pension benefit is still working, in this case because husband was retired at the time of the divorce, his pension benefit was fixed and no longer inchoate. See *ante*, ¶¶ 11-12. This distinction misses the point. It is always the case, whether or not the party accruing a pension is still actively working, that the parties *could* agree to allocate to the other spouse half of the fixed-dollar benefit that *would be* due to the working spouse if he or she retired on the day of the final divorce. But that is not typically done, and it is certainly not what this Court in *McDermott* directed should be done in the absence of an agreement. This Court embraced a coverture fraction approach not because of the inchoate nature of some pension benefits at the time of the final divorce, but because it is the fairest way to allocate a pension benefit. The considerations underlying that assessment — and, in particular, the role that the pension-accruing years during the marriage usually plays in

enhancing the post-divorce pension benefit — apply with the exact same force in cases in which the pension earner is retired prior to the final divorce. I am not suggesting that the parties are not free to mutually agree to a different allocation. But in the face of conflicting representations as to the parties' intentions, to rewrite the final agreement to embrace an analysis not based on the coverture fraction would be particularly incongruous in light of this Court's expressed preference for a coverture-fraction-based approach. The majority's analysis of this issue is best understood as reflecting a one-off decision based on a specific set of facts rather than a shift in this Court's embrace of the coverture-fraction analysis set forth in *McDermott*.

¶ 31. Nor did the trial court err in reaching this conclusion without first holding an evidentiary hearing. On appeal, husband argues that he was entitled to an evidentiary hearing on the parties' intentions at the time they executed the stipulation underlying the final divorce order. The problem is that before the trial court husband neither requested an evidentiary hearing nor proffered any evidence concerning the parties' intentions that would warrant an evidentiary hearing. As the proponent of a Rule 60(b) motion, and the party seeking to disrupt the finality of the original divorce order, husband bears the burden of proof with respect to the 60(b) motion. *Merchants Nat'l Bank of New Bedford v. Considine*, 135 Vt. 416, 418, 377 A.2d 1390, 1392 (1977). In his original motion requesting an ex parte order, husband asked for a hearing prior to a final order. Subsequently, following a status conference, the trial court issued an entry order requiring husband to respond to wife's just-filed motion to dismiss, and directing that "any party shall indicate whether a hearing is sought." Husband did not thereafter request an evidentiary hearing. He concluded a subsequent pleading by asking the court, "if the court deems it necessary, to set a date to hear arguments" on plaintiff's motion. This request did not signal that husband sought an opportunity to present evidence.

¶ 32. More importantly, husband did not proffer any evidence creating a disputed issue of fact that would require an evidentiary hearing. See *Altman v. Altman*, 169 Vt. 562, 564, 730 A.2d 583, 586 (1999) (mem.) (concluding no hearing required on Rule 60(b) motion in absence of disputed issue of material fact). Husband's recitation of the facts underlying the parties' determination of the percentage of husband's military pension benefit to be allocated to

wife is entirely consistent with both parties' positions. Nobody disputes that the length of their marriage and husband's years of service were factors in their calculus. Beyond that, husband made no effort to proffer evidence supporting his argument as to the parties' intentions as they bear on the question of how the final order would apply to these new circumstances outside the parties' expectations at the time of the final order. Even if we treated the representations of counsel in husband's pleadings as evidence, there still was no disputed issue of material fact. Husband did not offer an explanation of the derivation of the fixed 41.8% allocation reflected in the trial court's order that was at odds with the explanation proffered by wife. Instead, he argued that knowledge of the methodology by which the parties reached the 41.8% allocation was not necessary to resolve this case.

¶ 33. Because husband's argument rests on his claims about the intentions of the parties, and given that his description of the parties' intentions is inconsistent with the language of the final order and wife's own description of the formula the parties were seeking to implement, I cannot agree with husband that the methodology by which the parties derived the 41.8% is immaterial. In the absence of evidence about the derivation of the 41.8% figure, and in the absence of any proffer by husband as to what evidence he would introduce at a hearing beyond the assertions in his affidavit, it is hard to imagine what evidence the parties would introduce at a hearing before the trial court.

¶ 34. Given husband's burden to establish the basis for his Rule 60(b) motion, the clear language of the final divorce order, the absence of conflicting evidence concerning the parties' intentions at the time they signed the stipulation in the underlying divorce, and the absence of any request by husband to present evidence on the subject or proffer of evidence sufficient to override the plain language of the final order, husband has not demonstrated that the trial court abused its discretion in declining to hold an evidentiary hearing. The majority's holding to the contrary opens the door to a host of claims by pensioners whose stipulated or litigated qualified domestic relations orders played out in ways they had not expected on account of circumstances they had not anticipated.[6]

---

[6] Husband also argues that the court should rewrite the final divorce order on public policy grounds. I note that husband's admirable decision to serve our

¶ 35. I am authorized to state that Justice Dooley joins this dissent.

country for an additional period after his retirement was not without consequence for wife. Given that she was left without her share of the anticipated military retirement pay for three years, her receipt of the agreed-to percentage of an unexpectedly increased retirement benefit is not so unconscionable as to warrant setting aside the stipulated order.